Yes, thank you. Michael Rubin for Plaintiff Appellant, Karen Hartstein. I'd like to reserve four minutes if I may. Under California law, which controls this case, employees have a fundamental non-waivable right to be paid all of their earned and unpaid wages when their employment ends. If they're discharged under labor code section 201, they're entitled to be paid those wages immediately upon the end of their employment. If they quit, then they're entitled to be paid those wages within 72 hours after their employment ends. They also have a fundamental non-waivable right, under section 227.3, upon their termination of employment, to have all of their accrued vacation pay, which is wages. The California Supreme Court made that clear in suestes in 1982. They're entitled to have those additional wages paid out again if discharged under 201 immediately. If they quit under section 202, within three days. The district court in this case said that Hyatt's termination of Ms. Hartstein, which was an indefinite layoff, most importantly with no recall rights, which told her and 7,000 other Hyatt employees in California to stop work immediately. They lost access to their emails. They were told their vacation pay and personal time off would no longer accrue. And they were told that although Hyatt hoped that within two to three months conditions may change so that people might be given jobs back, they had no right to recall or rehire. And Hyatt advised them to seek unemployment insurance, which they were entitled to do under Campos and other cases. The district court said that even though these employees lost their jobs, had no source of income, no way to meet the fundamental requirements of life, groceries, rent, and so on, they were not discharged because the relationship was not completely severed. That has never been the law in California. In California the law is set forth in repeated manuals and opinion letters from the DLSC, the Division of Labor Standards Enforcement. The DLSC has been clear since the 1980s that a layoff for purposes of section 201 is equivalent to a discharge. It is a type of discharge as long as the employee has no contractual right to be recalled within the same pay period. So Council, I mean we've had a lot of different COVID cases and a lot of different scenarios and what we learn or what I have learned over and over again is we have all kinds of new problems that nobody ever anticipated when we were writing laws. And it seems like this is one of those cases. So you know where the standard rule you're describing makes perfect sense. I mean a difference here is all of these employees were laid off but there was everyone understood that Hyatt wasn't going to be out trying to find new employees, that it wanted all these same employees to come back as soon as it was able to operate when the world you know went back to normal. Do we not think about that at all? This was not a seasonal layoff, but I'm a labor lawyer. I see this all the time. Employers lay off workers for all sorts of reasons, not just because the growing season is over. What was the reason here? The reason was the pandemic. The hotels didn't have guests. The hotels were closed. The legislature I'm sure didn't, you know, specifically have that in mind. Nor did the legislature have to. The legislature had in mind the typical situation where an employer lays off workers because of lack of work, like a RIF, a reduction in force. Why do you say that? Is there a legislative history that supports that or something like that? There's repeated statements. Is that what they had in mind? There's repeated court which construed section 201 that equated layoffs, indefinite layoffs with no recall rights to a discharge. And the reason is because layoffs occur for many reasons. The key is what is the impact on the employee if the result of an employer saying you are not going to perform any more work because there's no work to be performed? The RIF example sort of highlights the point I'm trying to make in that we're trying to figure out if there's a continuing employment relationship. In the RIF situation, we're reducing force and there's no, at least in my experience, there's no expectation that this person who's being laid off because of a reduction in force has any expectation that they might be invited back. But that's not this scenario. In a typical layoff, employees often hope to be called back. Employers often say we would like to have the opportunity to bring you back, but there is no work. If we were to develop a new principle that depended on the reason for the reduction in work, this would be an unworkable standard, an uncertain standard, and would run contrary to the principles underlying the labor code that the California Supreme Court has repeatedly expressed. Why is that? Because from the workers' perspective, what matters is they have no right to be recalled. Whether it's COVID, whether it's a business downturn, whether it's a loss of an important contract, whatever the reason sparked the employer's decision that it can't have these employees. Not whatever the reason because you earlier, you know, accepted seasonal layoffs. Sure, seasonal layoffs is one of many examples. That's why you say whatever the reason, it's not whatever the reason because there's an exception right there. No, that's not an exception. Seasonal layoffs, if you look, for example, in Section 201, in Section 201.5, they talk about discharge and layoff in the same statute. Layoff is a type of discharge, and from the legislature's perspective, as construed by the expert labor agency in California. What we're trying to determine here is what type of discharge this action of the employer was. Right, and this was... In other words, you know, under the Section 201, I think as you're arguing points out, it really doesn't define discharge. So, I know of no cases that govern it, so the question is, where do we look and what's the answer? We look to the DLSC as the California Supreme Court to their... DLSC is the... The Division of Labor Standards Enforcement, which the California Supreme Court and Smith, in footnotes 7 on page 90, expressly deferred to in determining what is the proper construction of Section 202 of the Enforcement Manual. If an employee is laid off without a specific return date within the normal pay period, the wages earned up to and including the layoff date are due and payable. There's no distinction among the types of layoffs. If that was a statute, then clearly that's directly on point, and we answer that. I mean, one of the other things that, sort of, I'm not quite sure what to do with in this case, is all of these laws and rules are... And California, in particular, tells us we construe them in favor of the employee. These are for protection of employees. And here, what you're asking for may not protect the employees. For example, we're talking about paying out of accrued vacation time. You get laid off because of a pandemic, and if the world had fixed itself quicker than it did, and they're back to work in two months, and you've paid out all the vacation time, then the people who maybe had been holding up their vacation for a trip that fall are out of luck. So, do we not consider that? That has never been the test under any of the California cases. That's always the situation when someone is laid off, and then they could reapply for their job. But this is slightly different in that the likelihood that they're coming back to this job, at least at that moment when no one knew how long it would be until hotels were functioning again, seemed pretty likely. Because this isn't a... We can't afford... We have to reduce by 10% how many employees we have. This isn't... We're out of work before the season. This is... The world is shut down and no one's traveling, and we hope that it's back soon and that you'll be back to your job. And in the meantime, the employees have no source of income. As Swasta said, the accrued vacation time are wages. They earned that from their labor. They're entitled to be paid that. Yes, they won't have the opportunity, and no employee, whether severed or layoff, has the opportunity to take their vacation after that layoff date. But they are entitled to the money, and it's the money that pays the groceries, and it's the money that pays the rent. And that was... When 227.3 says that any dispute over whether someone's vacation pay has to be construed based on equity and fairness, they're talking about the equity and fairness to the employee who earned money but hasn't been paid that money. The same principle that Hyatt is urging here, that there be some continuing relationship, would also mean that in a typical case of firing, often it happens that when an employer fires an employee, they give the employee severance pay. They pay the COBRA benefits for a while. The only... You referred, Judge Forrest, to the continuing relationship. The continuing relationship articulated by the district court here involved two elements that were not benefits at all. One was a mistake because the letter expressly said, you're not going to accrue vacation pay or PTO. The complimentary hotel rooms were unavailable because the hotels were shut. The only benefit was that some employees got two months of paid health benefits. Other employees got no paid health benefits. Other employees... Weren't they also accruing vacation benefits? Only by mistake. At the time of the layoffs... They still got it, and then Hyatt didn't try to take it back. They didn't know they got it. The letter said... Again, the perspective of the employee. The employee had no idea because the letter said, you are not getting paid. There's no work. You're not accruing vacation benefits. That's page 459 and page 460. So there was the only continuing relationship. What is this test? This test would mean that an employer, in any case, instead of firing someone, could say, no, you're laid off. We hope you come back. Maybe it's COVID. There's still COVID out there. I wore a mask coming into the courtroom. An employee could be laid off. They could say, we hope you're coming back. We're going to pay a month of health benefits. When does the right to be paid your earned and overdue wages come in? After that month, after two months for some, it would mean that for many of these employees who were told that they weren't going to be offered a position back at a minimum for 8 to 12 weeks, those health benefits would have run out. It's an unworkable standard. It's a practical matter. The DLSC has set up a bright line standard. Let me briefly deal with the other issue in this case, which is whether the complimentary hotel rooms are considered part of wages. Those should have been paid out on discharge. Those should have been factored in to the regular rate of pay. You begin with a statutory presumption that all forms of remuneration constitute wages. That includes goods. That includes facilities. The key, as both sides recognize, is whether you have a contractual right to be paid those benefits, to receive those benefits. In this case, the district court, relying on a district court decision, the Best Buy decision out of the Northern District, said that the complimentary hotel rooms, which Hyatt pays for, which are guaranteed, which are an employee retention device, which were available after people has worked for a full year, so as compensation for work that they performed, is merely a gift. Well, the DOL regulations in California law make clear that whether a benefit is a gift or not depends entirely on whether you have a contractual right to it, whether you could sue if you didn't receive that benefit. In this case, as we pointed out throughout the record, the workers had a right to those complimentary hotel rooms. IRS treats them as... The right arises from what? Contract, as a result of the employment package. The contract says that if you're a full-time employee and you work for a year... So what you're talking about is like an employer's handbook or something like that? Correct, a binding, which is a binding... What are we talking about here? Yes, it's the employer's handbook, it's a stated policy. So it's a handbook? Yes, and it's... And the handbook said, you know, for so many weeks of work, you get so much vacation. If you're full-time, no, it's not vacation, it's the complimentary hotel rooms. If you work... Yes, if you're full-time, you get 12 days, if you're part-time, you get six days. That's guaranteed, it's a legally enforceable promise that takes it out of the gift provisions of the DOL regulations. It should have been included in the final pay that these workers received, and it should have been included in the overtime. I'd like to reserve my remaining time if I may. Thank you. Good morning, your honors, and may it please the court. Ian Gershengorn on behalf of Defendant Topeli Hyatt. In March 2020, the nation faced an unprecedented pandemic of uncertain dimensions. And so Hyatt did what everyone else did. It took measures to mitigate the immediate pain while buying time to see how the pandemic would unfold. And it tried, as it did so, to maximize flexibility for its employees in those unpredictable times. I'd like to make three points, if I might, at the start. First, under section 227.3, there is no right to payment for vacation pay until termination. That's the key statutory term, and there was no termination here. The district court correctly found that there was a continuing employment relationship and no permanent severance of the employment relationship when Hyatt, one, paid both sides of the health care insurance, when, two, all employees continued to accrue vacation time, which they were paid to the tune of millions of dollars. But as Mr. Rubin says, that was like a clerical error, wasn't it? So, Your Honor, I don't think that that's actually what the records... So, first, your point, which you said to him is exactly right. At the end of the day, they were paid millions of dollars. Second, clerical error, I don't think, actually captures it. What the record reflects is that the employees were kept in, quote, active status in the computer, and that meant they continued to accrue vacation. And so, it is correct that the initial letter erroneously said that they would not accrue, but they continued to accrue, and it is not correct, as Mr. Rubin suggested, that the employees didn't know this because they had access to the employee portal, which tells them what your accrued benefits are, what your salary is. On an ongoing basis, the record reflects this throughout the period, and so they could see the vacation accruing. In addition to vacation, employees had continued access to internal Hyatt communications, complimentary room programs, and other things like food drives and help with government forms that continued that employee relationship. But second, and this is a critical point, which you didn't hear about in the opening, in truth, the vacation issue is easier than that. Because Hyatt made all of the payments in June 2020, plaintiffs can only seek penalties, and penalties require willfulness. Under governing California regulations, there is no willfulness if the defendant has a good faith dispute, which is defined to be, quote, when a defendant, I'm sorry, when a defendant, quote, presents a defense, which if successful, would preclude any recovery on the part of the employee. Here, not only was such a defense presented, it persuaded Judge Fisher, the district court below, so no damages are available here. And third, plaintiffs are not entitled to any compensation for the complimentary hotel rooms, for more than 60 years, the Federal Department of Labor has said, quote, discounts on merchandise offered by retail establishments to their employees are not included in the regular rate of pay. Today, that proposition is embodied in a federal regulation, which we cite in our brief, 224B5. When that regulation was promulgated, the Department of Labor expressly addressed this issue.  ...are excludable from the regular rate. We're talking about, we're not talking about a federal law, we're talking about a state law. So no one disputes here, and this is at the reply brief at page 24. Nobody disputes that California follows the federal regulations when it comes to what's a part of the regular rate. I don't think there's any dispute on that. And so actually, the federal interpretation has been adopted by the California courts and governs here. Let me start with the vacation pay.  First, he referred to the DLSE letters. I'd urge the court to read them. First of all, the California courts have said over and over that those letters are not binding. Second, there's very little reasoning at all in those letters. But the California courts do say, I don't know exactly how they word it, but those letters are entitled to some degree of respect. Some degree of respect, Your Honor, when they address the issue and when they provide reasoning. And I urge the court to read the letters. They're very brief. And here's what I would say. There's almost no reasoning in them, and they don't address this issue. One of the letters doesn't touch vacation pay at all. The other one talks about whether you can use vacation during the time of a layoff. And third, they don't address this situation, which Your Honors have raised in the first part of the argument, which is there was a continuing relationship. So the other side keeps using words like layoff does this and layoff does that. But of course, our point is this was a furlough with a particular set of facts, right? It had a continuing employment relationship. So abstract terms plucked from cases that aren't dealing with vacation pay, like Smith, which of course involved the end of a service of a model in a one day contract. They have nothing to do with this case, right? And so this is a very special situation. Counsel, it seems to me to prevail. You have got to establish that discharge and termination means something different. Do you agree? I don't agree with that, Your Honor. I think I have to establish that termination is, that there was no termination here. And here's why I think it's critical. When the California courts, I think I can be agnostic on whether discharge and termination are the same, and the reason is this. What the California courts have said over and over in Soto and in Church and then in Naranjo is that the relevant statutory term is termination. It is at the point of termination that the right to vacation time becomes the right to vacation pay. If there's no termination under those cases, you have no right to, they never become wages, and so discharge is entirely irrelevant. So our point here is that there was no termination, and the district court correctly found that. Now, if discharge and termination mean the same thing, it doesn't matter, and discharge requires the payment of wages. In under 227.3, the vacation time never becomes wages until termination. So if there's no termination, there's no wages, and the discharge is irrelevant. My reading of the cases in California is that there's not precision. So, Your Honor, I would agree with part of that. So I think when you look at the cases, and I think the other side cites cases like cases that aren't dealing with termination at all. Those cases repeatedly use the words, I would say, imprecisely. Termination, discharge, they're sort of loosey-goosey, but they're not dealing with this issue. The cases that deal with vacation pay, which are Soto, which are Church, which is the first part of McPherson, Naranjo. Those cases, once you're talking about vacation pay, they focus like a laser on 227.3, which of course makes sense, right? If you're interpreting a statute, you go look at the provision, the specific provision, that governs vacation pay. And when you open the California Code, it's 227.3. Every time the California courts have addressed vacation pay, they focused on 227.3 and termination. But you're suggesting that, I mean, I guess I'm not quite sure. Frankly, I'm not quite sure entirely what your argument is of why it doesn't matter if there's a difference between discharge and termination. Would you agree, though, that California hasn't actually directly answered that question? So I think that's exactly right. And we would urge the court not to answer that question here. I think all you have to do- How do we not answer that question? So let me try one more time, because here's the thing. Here's the way I think the court needs to think about it. Upon discharge, you have to pay all wages, okay? The question in this case is, when did the vacation pay become wages? So the- And that question is not answered by 201. That question is answered by 227.3. And 227.3 says that vacation time becomes vacation pay at termination. So your answer right there, your discussion right there, highlights what I'm wrestling with, which is I think we have to figure out, does termination and discharge, do they mean different things? Because if not, then your argument fails. So I don't think so, Your Honor, and here's why. Because terminate, discharge, but let me say one other thing before I answer Your Honor's question directly. Of course, all of this, this debate we're having, the fact that Your Honor says this is unsettled, the fact that the courts are inconclusive, all of that just proves we have a slam dunk argument on willfulness, right? Because willfulness is about whether you have a defense in fact or a law that, if correct, would preclude liability. And I think this debate sort of shows why that has to be, why we have to be right at least on willfulness. But to go to Your Honor's question directly, and let me just say, like if, and so I would urge the court, like I think the easiest path is to say there's no willfulness. But if the court feels like it has to reach that question, we would say discharge and termination mean the same thing. We said that in the brief. But if I could just try one more time. They mean the same thing. Yes, I think they're both, I would say this. So then if that's true, how is it that your company didn't have to pay the accrued vacation at the same time that it paid earned wages? Because, so Your Honor, it doesn't have to pay it because there was a continuing employment relationship. You just told me that if we conclude that discharge and termination mean the same thing, that means it's where the relationship is over for purposes of paying out what you've accrued. No, I think, I don't think there's been a discharge, to be clear. And we said that in our brief. We don't think there's been a discharge. We think there's been a continuing employment relationship. So you don't even think that you needed to pay accrued wages? Well, Your Honor. At the moment that you sent everybody home? So we did pay, we did pay the wages. I know you did, but what your argument is suggesting is that you didn't, you weren't legally required to, you just did that as a matter of grace? I think the record is, is ambiguous about whether we paid in advance. We paid at the end of the regular cycle. But Your Honor, I, I think it's, I do think it's important to, to look at why there is neither deter, neither discharge nor termination. And it is because of those continuing relationships. I want you to answer my question. Yes, sure. You're telling me that Hyatt had no legal obligation to pay these people their accrued wages at the time it sent them home with no return date. Is that what you're saying? Yes or no? I am saying no, Your Honor. I'm saying yes, Your Honor. But I don't think the court has to reach that question. I mean, I agree, but I'm just, I'm just trying to make sure I understand what your position is. So, I just, just to be crystal clear, just, I'll, I'll say it one more time. But I, I gather Your Honor is not, I'm not making myself clear. But the reason why I don't think that termination and discharge have to mean the same thing is this. Your Honor is correct that at discharge, right, discharge, you have to pay wages. Okay? So we're all in agreement with that. So then the question is, what are wages? Right? To determine what are wages, you need to look at 227.3. Because that's when you figure out whether vacation pay is wages. So, at discharge, yes, absolutely, you pay the salaries. Those are wages. Absolutely, but the question is, do you pay for vacation time? The question is, are those wages? Otherwise, you don't have to pay them. And the wages are, they all, the time only becomes wages at, when there is termination. I'd like to address just a couple more points on this issue that your, your honors have raised. I think the the question about protection of employees is really critical here. We do think that this was an employee protective approach, that when you look at what we did, right? We have, and the record shows this, we have employees who hoard their vacation time so they can take extended trips to see family overseas. Had we paid out all the vacation time and then rehired as we had hoped, and everybody hoped the pandemic would be short, those employees would have been out their vacation time. Now, of course, the, the employees had a choice. And again, the record shows to the tune of millions of dollars, the employees exercised that choice. Some employees said, I'd rather have my vacation time. And we paid it, right? And the record shows more than $2 million over three different properties were paid. Other employees recognized, as we did, that they might come back. And so they let the vacation time accrue. Other employees let it accrue for a few weeks and then cashed out, and then got a second check in June when they were, when they were actually terminated. And so I think the, the approach that HIA took in the context of the, of the pandemic was actually the most employee friendly. And then just the last point on vacation. Before you move on, I, I want to follow up on one thing that your friend across the aisle talked about. Yes. I mean, I, I, I don't disagree that, you know, HIA is facing extraordinary circumstances, and it seemed like it was doing its best trying to figure out how to handle this. But opposing counsel has argued that if we just leave it to the employer's discretion about whether to call something a termination or a discharge or whatever, when we're in these sort of uncertain times, that we leave the opportunity for abuse. Why should the employer just get to define whether we have terminated the relationship or not when an employee has no, has, has been given no, like, come back Thursday or come back in two weeks? Right. So two answers. First, we are not offering an, an, whatever the employer intends standard. We are looking at the objective indications of continuing employment. The millions of dollars in healthcare benefits, millions of dollars in accrued vacation, continued relationships. So it's not just whatever the employer says. Well, except for at that moment, HIA couldn't, couldn't assure its employees of anything. But, but critically, this is then, I think, the second point, Your Honor, which is, directly answers your question, which is, it was up to the employee to choose. If the employee wanted all of her vacation time, she could get it, and a number of employees did. If the employer want, employee wanted to wait a month and then get all their vacation time, she could do that too. And if the employee wanted to wait and see what happened through the pandemic till June, the employee could do that too, and employees did that. So what we did was not something that offers an opportunity for abuse. To the contrary, it offered the employees the maximum flexibility. So two points, as I see my time is running short. Again, all of this dispute, I think, falls away if your, if Your Honors deal with the willfulness question, right? This kind of dispute, like, there is no reasonable argument, we think, that there was, that we failed to offer a defense based in law or fact which, if successful, would preclude any recovery on the part of plaintiffs. And so, we think that the willfulness issue disposes of this question. If I might just very briefly, I know I'm running low on time, address the hotel rooms issue. So let's hold on. Do you guys have questions about that? No. Okay. No. Okay. Thank you, Your Honors. We urge the court to affirm. All right. I think you used all your time, but we'll give you a minute to hit any points you want to reiterate. Four very quick points. Yes, we agree with counsel that termination and discharge mean the same thing. And that's what the California Court of Appeal held in Singh in 2010. That's what Labor Code 201.5 says. And that's what the DLSE said. That's our request for judicial notice, Exhibit A, the 1998 opinion letter. Second, no court in California has adopted a COVID-specific exemption for layoffs. Layoffs are layoffs. However, they are triggered for whatever cause. Third, we absolutely disagree that this case would be over if the district court had made a finding of no willfulness. First of all, Maldonado v. Epsilon Plastics makes clear that a subjective intent of an employer makes no difference at all in the good faith analysis. Here we have admissions, repeated admissions that they stuck their head in the sand. They didn't look at their own lawyers' newsletters, the Chamber of Commerce provisions. We have PAGA claims in this case that don't require a violation of 203. There's a declaratory judgment claim in this case. So this case continues even if the district court had found willfulness. And then finally, as to complete severance of the employment relationship, well, California has a bright line rule. If this court were, at a minimum, summary judgment shouldn't have been granted because, as you'll see from the record, Volume 3, pages 495 to 505, Hyatt treated different groups of employees differently. It's said that it's going to be at least 8 to 12 weeks before we decide whether we may rehire folks or not, although some people didn't even say that, but for some folks, it didn't offer any health benefits. For others, it offered only the health benefits through March that are repaid for. Others, like Plaintiff, it offered to pay health benefits for April and May only, even though the 12 weeks- Counselor, you've gone over time. Do you have further questions? No. Further questions? Thank you. Thank you. All right, the matter of Hartstein versus Hyatt Corporation is submitted.
judges: TASHIMA, FORREST, Cardone